## MALLORY v. MACKAYE.

(Circuit Court, S. D. New York. March 24, 1898.)

**1. COPYRIGHT AND INVENTION—TRANSFER—RESCISSION OF CONTRACT.**

Defendant engaged his services to plaintiff for a period of 10 years, as an author and inventor, and stipulated that the property in his productions, including his time and services, should belong exclusively to plaintiff, in consideration of an annual salary of $5,000, and a proportion of profits in excess of certain amounts. *Held*, that a play written by defendant, and a patent procured by him and transferred to plaintiff, became the absolute property of the plaintiff, and that changing the rates of admission, and omitting the name of the author from the announcements and advertisements, did not justify him in departing from the contract, and himself using the play.

**2. SAME—PROFITS.**

Under a contract which provides that the product and income from the intellectual and physical labor and skill of an author and inventor shall belong absolutely to plaintiff, and that the author and inventor shall be paid a certain proportion of cash earnings or profits above a certain amount, a play and patent produced during the existence of the contract are not to be considered as profits, while earnings invested in a theater are to be so considered and accounted for.

Lewis Cass Ledyard, for complainant.
E. W. Tyler, for defendant.

WHEELER, District Judge. Steele Mackaye, the intestate, by written contract under seal, agreed to give and devote to the service of Mallory the whole of his time and energy, as Mallory might direct, in any of the capacities of an author, a manager, an actor, a director, or in any other capacity having any connection with theatrical labor, and that the entire product and income of his intellectual and physical labor and skill should belong absolutely to Mallory, and be his exclusive property; and, in consideration of these covenants, Mallory agreed to pay Mackaye, and Mackaye agreed to receive, "as full compensation, except as hereinafter otherwise provided for," an annual salary of $5,000, in equal monthly installments. The contract further provided:

"Fourth. The said Marshall H. Mallory further agrees that if, at any time, the sum of the profits produced by or resulting from the enterprises in which the aforesaid services of the said Mackaye may have been employed by him, the said Mallory, shall be equal to twice the amount of money, with interest, expended by the said Mallory in and upon the said enterprises, or, if the amount so expended shall be less than thirty thousand dollars, at such time as the sum of the profits produced by or resulting from the said enterprises shall be equal to the amount so expended by the said Mallory, with interest, and the sum of thirty thousand dollars in addition, then, at that time, the said Mallory agrees to increase the before-mentioned annual salary to be paid by him to the said Mackaye

by a sum which will be equal to one-fourth part of the net profits produced in each year thereafter from the enterprises in which the services of the said Mackaye shall by him have been employed." That the duration of the contract should be 10 years from July 1, 1879, with the privilege of renewal to Mallory so long as he should desire, upon the same terms, and of at once terminating it at the end of any year; and: "Sixth. The said Marshall H. Mallory further agrees that if, after the total earnings produced by or resulting from the enterprises in which the services of the said Mackaye may have been employed by the said Mallory shall have amounted to a sum equal to the amount of money, with interest, expended by the said Mallory in and upon the said enterprises, if after such time this agreement shall be terminated as herein provided for, and at the time of said termination any cash earnings or profits of the said enterprise over and above the last above mentioned sum shall be in existence, then at such termination the said Mallory agrees that, as compensation to the said Steele Mackaye for the termination of this agreement, and the cessation of his salary under it, he will pay to the said Mackaye a sum which shall be equal to one-fourth part of the above-described existing cash surplus."

Under this contract Mackaye completed the play called "Hazel Kirke," which was copyrighted, and an invention of a double stage, which was patented. Mallory procured a lease of the premises, and completed the Madison Square Theater, with the patented double stage; and Hazel Kirke was played there, and by traveling companies, with great success, under the management of Mackaye, and general direction of Mallory, until January, 1881, when Mackaye claimed that Mallory had violated the contract, and began presentation of the play himself elsewhere. Mallory brought this original bill upon the contract to restrain such presentation, and a preliminary injunction was thereupon granted; and he terminated the contract July 1, 1881. Mackaye brought this cross bill for a decree of rescission of the contract, and for his share of the profits and property. What Mackaye became dissatisfied about, and for which he claimed to rescind, was a changing of rates of admission that he deemed injurious, and the omission of his name from announcements and advertisements that he thought intentionally and needlessly humiliating, and perhaps justly so, and other minor matters; but all were within the ownership and direction given to Mallory by the contract, and seem to have fallen short of being any adequate justification for departing from such an important engagement, and taking the play with him. Mallory therefore seems to have been at all times entitled on final hearing, when reached, to a decree making the preliminary injunction perpetual. Such a decree is necessary to the carrying out of the rights of the orator in the original cause now. As Mackaye had no sufficient grounds for rescission, his rights to the property must be ascertained from the provisions of the contract itself with respect to a termination of it. Mackaye v. Mallory, 12 Fed. 328. Aside from the theater, Mallory had, according to his own testimony, received $58,793.99 more than he had expended; and he had expended upon that $95,000. From other testimony his interest in the theater appears to have been well worth $65,000. The event was such that he has declined to show what the actual value turned out to be. This value was a part of the profits of the enterprise in the hands of Mallory. The play and the patent are said in argument for the administratrix to be such profits, which may be true, but they are also products of the services of Mackaye, which

were expressly to become absolutely the property of Mallory, while such an investment as the theater itself was not so mentioned. To let that absorb the cash earnings, and allow Mallory to retain it because it was not cash, would not seem to be equitable or just. In this view, the profits, after making a correction of $500 for a retainer in this litiga- tion, would be $29,293.99, of which Mackaye was entitled to one-fourth, $7,323.49. The footings of accounts have been put in evidence, and may require a change in these figures on settlement of the decree. In- terest would follow, especially as the defendant retained the profits after demand, making gain from them. The jurisdiction in equity for this relief in the cross cause is challenged, but the following of and accounting for the profits, in which there was a joint interest, seem sufficient to uphold it. Decree for plaintiff, making injunction perpet- ual, with costs, in original cause; and for plaintiff, for $7,323.49, with interest and costs, in cross cause.